### GIBSON v. ATLANTIC CO.
Civ. A. No. 2555.

District Court, N. D. Georgia,
Atlanta Division.

Nov. 27, 1945.

Walker & Kilbride and Richard E. Cotton, all of Atlanta, Ga., for plaintiff.

W. K. Meadow, Pope F. Brock, and Spalding, Sibley, Troutman & Brock, all of Atlanta, for defendant.

UNDERWOOD, District Judge.

The above case came on regularly for hearing on the merits and was tried to the Court without a jury.

Under the Fair Labor Standards Act, petitioner sues to recover alleged actual unpaid minimum wages and unpaid overtime earnings and for an additional equal amount as liquidated damages and for reasonable attorney's fees.

### Findings of Fact.

Defendant, during the times in question in this suit, was engaged in interstate commerce and substantially all of the product manufactured by it was produced for and transported in interstate commerce.

Petitioner was employed by defendant at its Inman Yard Icing Plant on the Southern Railway, which is about two miles from the nearest other plant of defendant. The work done at said plant was primarily the filling of the bunkers of railroad refrigerator cars with ice and salt. The plant consists of storage room for salt, an icing platform, three ice storage rooms and machinery for cooling the storage rooms and for moving the ice to platforms. A small coal yard is operated at this plant during the winter months, but no coal was delivered at night. (Record, p. 66.)

The amount of work done at the plant varied according to the season. During the months of June, July and August, the peach season, 2500 to 3500 cars were iced. During other months the number of cars iced varied from 40 to 300 per month.

Plaintiff was employed by defendant as night foreman of the plant from October 24, 1938 through February 22, 1941. His regular working hours were from 6 o'clock p. m. to 6 o'clock a. m., seven days a week, for which he was paid a weekly salary of $21. Plaintiff worked during such period, except for a two-weeks' vacation with pay in 1939 and 1940, the full eighty-four hours a week, and in addition, certain hours overtime. While the evidence as to the amount of overtime is insufficient for exact computation, nevertheless, plaintiff has, by a preponderance of the evidence, shown that such overtime amounted at least to ninety-seven and one-fourth hours.

During the entire period from October 24, 1938 through February 22, 1941, plaintiff was the only regular employee on duty at the plant, other than a Negro, subject to call, who slept on the premises, except during the nine weeks of the peach season, when at least four other men were regularly on duty. During the peach season Mr. Parrot was in charge at night a large part of the time (Record, p. 81), often staying all night. (Record, p. 107, p. 138.) Mr. Parrot was manager of the plant (Record, p. 65), both day and night (Record, p. 102), received more as compensation than plaintiff (Record, p. 66) and had jurisdiction over plaintiff (Record, pp. 67, 82, 102). Often there were times when plaintiff would not have a single car to ice and there were several months in the year when he had very little to do "except to simply remain at the plant and be there when needed." (Answer to interrogatory No. 8.) When help was needed to ice the cars, plaintiff would send for men from a list of those who regularly worked for defendant or who were sent there in trucks by Mr. Parrot (Record, p. 136) or call them out of a large group who always, during the busy season, came to the premises of the plant to work should the opportunity offer. Plaintiff did no more than tell some of these men to go to work loading ice and salt into cars and let them go when the work was done. Substantially all of the time the cars were being iced, a representative from the Fruit Growers Express, for whom the icing was done, was present supervising the icing of the cars and directing the amount of ice and salt to be placed in the cars. (Record, pp. 51, 17, 18, 72 and 117.) The small portion of the time that such representative failed to appear, plaintiff did this work. Plaintiff also did the actual work of icing cars like other laborers, kept records of the cars iced and would notify defendant when ice was needed if there was danger of running out and kept track of all cars coming in. (Record, p. 16.) The ice was kept in storage at the plant but sometimes loaded directly from cars on to the loading platforms.

There is evidence that plaintiff had authority to hire and fire men, but it appears that the only hiring he did was to call men already regularly employed by the defendant or waiting on the premises subject to be called. There is no evidence that any specific men were ever discharged, though there was testimony that he had authority to do so, except in one instance, in which case he was overruled and the man rehired. Merely letting the men go after they had finished their work would hardly be called discharging them in the sense that the word is usually used. In answer to the hypothetical question whether he would discharge a laborer if he got drunk or refused to work, plaintiff replied that he would. There is no evidence that he had anything to do with fixing their wages or terms of employment. A large part of the time, during the slack season, when no more than two cars were to be loaded, plaintiff iced them himself, but if there were more than two, he was allowed to call the Negro who slept on the premises to help him. (Record, pp. 15, 30, 133 and 138.)

For the greater part of the time, plaintiff was at the plant all alone, and, except for the actual icing of cars by himself or, on infrequent occasions, with the aid of one or two more to help him, really acted as

nothing more than a watchman. Far more than twenty per cent. of his hours of work was of the same nature as that performed by non-exempt employees. If anything unusual occurred or there arose any matter involving the exercise of important discretion, he would call Mr. Parrot, the plant manager, for instructions. (Record, p. 102.)

## Conclusions of Law.

The question presented is, whether plaintiff was covered by the Fair Labor Standards Act, or exempt under the exception to the Act exempting bona fide executives.

Section 13(a) of the Fair Labor Standards Act, among other things, provides: "The provisions of Sections 6 and 7 shall not apply with respect to (1) any employee employed in a bona fide executive, administrative, professional, or local retailing capacity, or in the capacity of outside salesman (as such terms are defined and delimited by regulations of the Administrator) * * *." 29 U.S.C.A. § 213.

In defining the words "bona fide executive", the Administrator used the following language:

"The term 'employee employed in a bona fide executive * * * capacity' in section 13(a) (1) of the act shall mean any employee—

"(A) Whose primary duty consists of the management of the establishment in which he is employed or of a customarily recognized department or subdivision thereof, and

"(B) Who customarily and regularly directs the work of other employees therein, and

"(C) Who has the authority to hire or fire other employees or whose suggestions and recommendations as to the hiring or firing and as to the advancement and promotion or any other change of status of other employees will be given particular weight, and

"(D) Who customarily and regularly exercises discretionary powers, and

"(E) Who is compensated for his services on a salary basis at not less than $30 per week (exclusive of board, lodging, or other facilities), and

"(F) Whose hours of work of the same nature as that performed by non-exempt employees do not exceed 20 per cent. of the number of hours worked in the work-week by the nonexempt employees under his direction; provided that this sub-section (F) shall not apply in the case of an employee who is in sole charge of an independent establishment or a physically separated branch establishment." (29 C.F.R. 541.1.)

The coverage provided in the Act is general and the exception is specifically set out.

The burden of proof in showing that a particular employee comes within the exempted class, rests upon the defendant.

[2] This may be a borderline case, but I find upon the facts above stated that plaintiff was not a bona fide executive as defined by the Administrator and that he was not exempt from coverage of the Fair Labor Standards Act. Coming under the Act and not having received the minimum wages provided in the Act, he is entitled to recover.

Under the provisions of the Fair Labor Standards Act applicable in this case, defendant should have paid plaintiff, each week, at the rate of 25¢ per hour for 44 hours, and 37½¢ per hour for 40 hours, during the period from October 24, 1938 to October 24, 1939; at the rate, each week, of 30¢ per hour for 42 hours, and 45¢ per hour for 42 hours, from the period October 24, 1939 to October 24, 1940; at the rate, each week, of 30¢ per hour for 40 hours, and 45¢ per hour for 44 hours, during the period from October 24, 1940 to February 22, 1941, making a total which defendant should have paid plaintiff, excluding overtime for the two weeks he was on vacation with pay, of $3,504.90. He was actually paid $2,562, leaving unpaid compensation to the amount of $942.90. In addition to the $942.90, plaintiff was entitled to pay for additional overtime, above 84 hours per week, at the rate of 45¢ per hour for a total of 97¼ hours, or $43.76, which, added to the above-mentioned shortage of $942.90, makes a total of $986.66.

This, under the law, should be doubled, making $1,973.32, and reasonable attorney's fees of $250 should be added thereto, making a grand total due plaintiff by defendant of $2,223.32. 29 U.S.C.A. § 216.

Whereupon, it is considered, ordered and adjudged, that plaintiff do have and recover of defendant the sum of $2,223.32.